The Citizens National Bank, of Washington, Iowa, Appellant, v. R. W. Gardner, Wilbur Gardner, as Guardian of R. W. Gardner, Matilda Gardner, and others, Appellees.

Chattel mortgages: MENTAL CAPACITY OF MORTGAGOR: EVIDENCE. In 1 this action which is a suit upon promissory notes and to foreclose chattel mortgages securing the same, the evidence is reviewed and held to show mental incapacity of the mortgagor at the time he executed the notes and mortgages in question.

**Same:** NOTICE.   The evidence is also reviewed and held sufficient to charge the mortgagee with notice of the mental incapacity of the mortgagor.

**Same:** COUNTERCLAIM BY GUARDIAN : ADMISSION OF PLAINTIFF'S CAUSE OF ACTION.   A guardian of an incompetent chattel mortgagor may, as in this case, counterclaim against a suit to foreclose the mortgages for payments made by the mortgagor from a sale of part of the mortgaged property, without conceding thereby the validity of the mortgages.

**Taxation of costs.**   Where the only issue in a suit to enforce a chattel mortgage was the mental capacity of the mortgagor at the time of executing the same, which was determined against the plaintiff, the costs of the action were properly taxed to plaintiff.

**Judgments:** CORRECTION OF SAME.   The correction of a judgment entry so as to conform to the appellant's demand for recovery, although made subsequent to notice of appeal, will not necessitate a reversal of the case on that ground.

**Appeal:** REVIEW OF PARTICULAR ISSUES.   Where no appeal is taken from the judgment upon particular issues the same will not be reviewed although argued on the appeal.

**Taxation of costs.**   Where the plaintiff, as in this action, brought certain parties into court and the substantial issues were determined against its claims to a preference over them in the distribution of a particular fund, the costs of the action were properly taxed against plaintiff.

*Appeal from Washington District Court.*—HON. W. G. CLEMENTS, Judge.

MONDAY, MARCH 14, 1910.

ACTION in equity to recover the amount of certain promissory notes made by the defendant, R. W. Gardner, and to foreclose two chattel mortgages securing the same. There was a decree for a recovery by plaintiff for the amount of the notes sued upon with attorney's fees, but denying a foreclosure of the mortgages.   The plaintiff appeals.   *Affirmed,*

W. M. Keeley and W. H. Butterfield, for appellant.

Eicher & Livingston, Wilson & Wilson, Charles A. Dewey, and S. W. & J. L. Brookhart, for appellees.

WEAVER, J.—While the pleadings and evidence in this case are very voluminous and have necessitated the examination by us of over four hundred pages of printed abstracts, the ultimate questions of fact and of law are not very difficult. R. W. Gardner, an unmarried man of forty years of age, lived in the parental home from the time of his arriving at his majority, and during most of the time leased and operated a farm belonging to his mother. During the later years preceding the transaction here in controversy, he also held in his own name an equity in another one hundred and sixty acres of land in the same neighborhood. He had been, for a considerable period, engaged in buying, feeding, and selling cattle and hogs, and in that business became indebted to the plaintiff bank and to the Citizen' Savings Bank of Washington, Iowa, which indebtedness was evidenced by six several promissory notes of the said Gardner to the plaintiff and two other notes executed by him to the savings bank, both of which have since been transferred to the plaintiff. On October 15, 1907, the president and the attorney of the plaintiff bank visited Gardner at his home and procured from him the chattel mortgages in question upon substantially all his personal property, to secure the payment of the notes above referred to as well as an overdraft of $323.69, for which a new note was then made. They also obtained his agreement to convey the land owned by him to a trustee to secure said indebtedness. On the 28th day of the same month, the said R. W. Gardner was adjudged insane by the commissioners of insanity for Washington county, and an order was subsequently entered for his confinement in the state hospital for the insane.

On the 7th day of the following month, he was adjudged by the district court to be of unsound mind, and the defendant Wilbur Gardner was appointed guardian for the preservation of his estate. Later said guardian sold and converted the mortgaged property into money, which by order of the court and consent of the parties has been deposited to be held in lieu of said property and subject to the judgment and decree of the court as shall be found just and equitable. In this action the plaintiff bank seeks to establish its mortgage liens and have the money in the guardian's hands arising from the sale of the mortgaged property applied to the payment of its claim. In defense, the guardian does not attempt to dispute the indebtedness of his ward to the bank, but pleads that the giving of said mortgage, with other transactions occurring at the same time, was in effect a general assignment with preferences, and therefore void. He further alleges, by way of defense, that at the time of making said mortgages R. W. Gardner was insane and incapable of an intelligent comprehension of the acts in which he was engaged, and that plaintiff had knowledge of such fact at the time Other matters were pleaded by way of defense and counterclaim, but their consideration is not involved in this appeal. Issues were also joined between plaintiff and certain other creditors of the ward; but no appeal has been taken from the decree of the court with respect to them, and we need not cumber this opinion with their statement. The result below seems to have turned upon the issue as to the sanity of R. W. Gardner at the time of making the mortgages, and this was found against plaintiff. If that finding is correct, there is nothing in the decree of which plaintiff can rightfully complain.

Appellant concedes that, very soon after the execution of these mortgages, Gardner "developed some evidences of mental unsoundness," that he was addicted to some extent at least to the use of opium or laudanum and mor-

phine, and that he sometimes indulged in intoxicants to excess. The adjudication of his sanity is not denied; but it is the contention of appellant that up to and including the time of giving said mortgages, and for at least some days thereafter, he was entirely competent to transact business in a rational manner, and was at all said times legally competent to bind himself by contract. In support of this contention, several witnesses, who had known R. W. Gardner more or less intimately and had done business with him in recent years, gave it as their opinion that he was of sound mind. Some of them admitted their knowledge of his use of drugs and intoxicants, and related instances when they had seen him stupefied and overcome from the effects of such indulgences. The testimony most directly in point in plaintiff's behalf is given by its president and attorney, who visited him on October 15, 1907, and procured the security for his indebtedness. They detail with much minuteness his appearance and conduct on that occasion, showing it to be that of a rational and competent person, and express the opinion that he was of sound mind. The president of the bank claims that, until a few days prior to this transaction, he never had any knowledge of Gardner's drug habit, and that the information made him uneasy and was one of the reasons leading him to seek the security. No expert testimony was offered on the part of the plaintiff. On the other hand, the defendants introduced an equal or greater number of neighbors and acquaintances, who also had dealings with Gardner and opportunity to observe his conduct over a considerable period of years, and they unite in the opinion that during all that period there had been a marked but. gradual deterioration in the physical and mental quality of the man, and that for the last several years he had been of unsound mind. Two physicians, who had known him well and had attended him or the family of which he was

*(margin note: 1. CHATTEL MORTGAGES: mental capacity of mortgagor: evidence.)*

a member, speaking from their personal knowledge and observation of his habits and condition, express with emphasis their opinion that during the month of October, 1907, and for a considerable period prior thereto, R. W. Gardner was of unsound mind and incompetent to transact business.

It appears without material dispute that Gardner had contracted the opium habit as early as 1892, and from that time until he was committed to the hospital for the insane, with a possible interim from 1895 to 1898, the abnormal appetite grew upon him, until during the later years his daily consumption of the opiate in the form of laudanum reached proportions which would seem incredible were the story not vouched for by so many different witnesses whose character for veracity is not impeached. His purchases from a single dealer at different periods are shown to have been at the rate of from 1 to 2½ pints at intervals from three to five days. Two purchases of a pint and a pint and a half, respectively, were made in one day. Another druggist says he sold him in quantities averaging eight ounces at a time about once in three weeks. His traveling companions testify to his purchases and use of other large quantities when away from home. He also drank intoxicants to excess. This course of living and conduct produced its natural result in physical, mental and moral degeneration. From a young man in good health, medium size and weight, he had developed, at early middle age, a weight of near 240 pounds, an increase which the witnesses speak of as "fat" or "bloat." From a more than ordinarily respectful and affectionate son, he came to treat his mother with abuse and contempt. He allowed himself to become in some manner entangled with a woman in Chicago to whom he made frequent contributions in money and provisions. His business was not handled wisely or discreetly. He was forgetful, was frequently seen in a drowsy condition, was nervous and excitable;

subject to hallucinations, saw sights and heard noises not perceptible to others who were with him, was afraid to be alone in the dark, and in many ways gave evidence of his weakened powers.  A witness for the plaintiff saw him at one time asleep on the fence at the pens in the Chicago stockyards, and saw him again in Kansas City when he "could neither walk nor talk and was too far gone to speak."  Another of plaintiff's witnesses at one time carried him from the field when he was absolutely paralyzed, "did not know anything.  I thought he was going to die.  The folks said he had taken an overdose of laudanum.  He came out of it, and we took him to the house and told Mrs. Gardner to keep him there."  He spent much of his time in writing out numerical calculations having no apparent purpose and invested money on the Board of Trade.  Appeared to think he was in prosperous business condition when in fact he was hopelessly insolvent.  The medical testimony is to the effect that the long-continued use of opium in large quantities tends to produce mental aberration culminating in dementia, though some persons are able to indulge to excess without such results.  The opium eater is apt to have illusions.  It produces confusion of ideas and loss of will power.

Other facts and circumstances were shown in evidence by the plaintiff and defendants tending in some degree to corroborate their respective theories of Gardner's mental condition; but we can not prolong this opinion to set them forth.  Such matters as we have already stated are sufficient to indicate the general trend of the showing made on either side.  We have read the record with the care its importance demands, and are abidingly satisfied with the findings of the trial court upon the principal fact in issue.  We think it clear beyond all reasonable question that, at the time the mortgages were executed, Gardner was a mental wreck without rational comprehension of

the real nature of his act and without capacity or will power to protect his own interests. The plaintiff parted with no new consideration for the execution of these instruments, and there is, consequently, nothing in the hands of the ward or of his guardian which equity will require him to restore as a condition precedent to his denial of their validity.

It is further urged on the part of the bank that, even if Gardner was of unsound mind, it had no knowledge of the fact, and, the transaction in itself being reasonable and fair, it is enforceable against the guardian. Without attempting to define the limits of the rule which is here invoked, we have only to say that we think the record fairly shows that the execution of the mortgages was obtained under circumstances which charge the bank with notice of Gardner's mental incompetency. The guardian testifies that before this date he went to the president of the bank, called his attention to Gardner's condition, and told him that he (Gardner) did not know what he was doing. The president denies the latter part of this statement, but admits he was then told of Gardner's bondage to the opium habit, and that this information was what incited him to activity in getting security for the bank's claim. Moreover, if the testimony of a large majority of the witnesses it to be believed, Gardner's general demoralization must have been too patent to escape the notice of men of ordinary observation and experience. The haste manifested in procuring the mortgages and the manner of their procurement also give ample support to the theory that appellant was quite well aware of the real condition of affairs.

*2. SAME: notice.*

It further appears in the record that within a day or two after giving the mortgages Gardner, with plaintiff's consent, sold some of the mortgaged hogs; the money therefor being paid to the bank. The receipt of such

money was pleaded by the guardian as a counterclaim to

**3. SAME:**
**counterclaim**
**by guardian:**
**admission of**
**plaintiff's**
**cause of action.**

the plaintiff's action and this, it is urged, operates as a ratification of the mortgages. We can not so regard it. If Gardner was of unsound mind, his act would manifestly not operate as a ratification, and the counterclaim pleaded by the guardian does no more than recognize the fact that the bank has procured a sum of money from the sale of the ward's property and asks proper credit therefor. This we think he may do without in any manner conceding the validity of the mortgages.

The court taxed in favor of plaintiff and against the guardian the ordinary costs which would have attached to a judgment by default, but assessed the costs of the

**4. TAXATION OF**
**COSTS.**

trial upon contested issues to the plaintiff, and upon this error is assigned. The order seems to be right. The entire contest centered around the issue made upon the mental condition of the ward and the validity of the mortgage, and, this being found against the plaintiff, it can not be heard to deny its liability for the costs thus occasioned.

Some point is also made on the fact that the court at first entered judgment for the plaintiff on the original consideration of the promissory notes, but later, during

**5. JUDGMENTS:**
**correction**
**of same.**

the same term, corrected the entry by giving judgment against the ward for the full amount claimed by plaintiff with interest and attorney's fees as provided for in the notes. If we understand appellant's counsel, they claim to have served their notice of appeal before this correction of the judgment entry was made, and, although the correction gives precisely what plaintiff demanded, so far as the amount of recovery is concerned, we must look alone to the original erroneous entry and reverse the trial court for an error which has been corrected, and then proceed to grant the plaintiff the very relief which has been awarded to it below. The

statement of the proposition is its own sufficient answer. If there was any error in the original judgment, it is, in view of the entire record, without prejudice to the plaintiff.

Other questions have been argued, and counsel have to some extent gone into a consideration of the issues joined between the plaintiff and other creditors of R. W. Gardner, who appeared and resisted its claims to a prior lien upon the fund in the guardians' hands; but it is unnecessary to review or pass upon them here. No appeal has been taken by either party from the judgment of the district court with respect to these issues.

6. Appeal: review of particular issues.

The plaintiff does complain because costs were not taxed against these contesting creditors; but we see no reason for interfering with the taxation as made by the trial court. The plaintiff itself brought these parties into court, and its claim to a preference over them in the distribution of the fund was denied. The substantial issues were determined against its claim, and the costs properly follow.

7. Taxation of costs.

The rules which govern this case are too elementary to require any discussion of the authorities. The facts alone afford the only ground for debate. We think they are with the defendant, and the decree appealed from must be affirmed. Appellant's motion to strike appellees' amendment to abstract is denied. *Affirmed.*